PROVOSTY, J.
In these two consolidated suits, plaintiff seeks to hold the Arcadia Planing Mill Company responsible on a note' made to its order and bearing its indorsement. The maker of the note is J. A. Cleaton, who is also made defendant, and does not deny his liability. The note was accepted and indorsed for the company by W. F. Nelson, who also indorsed it individually, and is a defendant in the suit, and does not deny his liability. Judgment is asked also in solido against the members of said company, namely, C. F. Johnson, A. B. Bolinger, and Dait Young. Their defense, like that of the company, is that the said company never had any connection whatever with said note, which was improperly made payable to it, and was indorsed for it by Nelson without authority.
[1,2] The said company and its members are nonresidents, and were proceeded against through a curator ad hoc and by attachment. They bonded the attachment; and the first question which arises in the case is as to whether they thereby accepted the jurisdiction of the court and made themselves parties to the suit. The affirmative has been several times decided. Hollingsworth v. Atkins, 46 La. Ann. 520, 15 South. 77; Williams v. Gilkeson-Sloss Co., 45 La. Ann. 1013, 13 South. 394; Succession of Baumgarden, 35 La. Ann. 130; Rathbone v. Ship London, 6 La. Ann. 439; C. P. 259. In their petition for the bonding of the attachment, the defendants expressly reserved their right to except to the jurisdiction of the court and to the citation, and declared that they appeared in no way, except for the sole purpose of bonding the attachment; and they now contend that this special reservation differentiates this case from the foregoing decisions. The rule is that an appearance to the suit, except for the purpose of objecting to the jurisdiction, or to the process or citation, subjects defendant to the jurisdiction of the court. A defendant may, without subjecting himself to the jurisdiction of the court, come in and ask to be dispensed from answering the suit, or, in other words, decline to appear, either because the court has no jurisdiction, or because the process for bringing him into court has been faulty, and therefore insufficient; and he may also ask for the removal of the suit from the state to the federal court; but he cannot, without subjecting himself to the jurisdiction of the court, apply for any other relief than this. The property stands in the I court as his representative in his absence; *291 if he comes in and withdraws the property and puts himself in its place, he must be considered as being in court for all the purposes of the suit.
The note sued on was executed under the following circumstances: A sawmill and planing plant and appurtenant timber lands were advertised to be sold at judicial sale at Arcadia in this state. The Union Mill & Lumber Company of St. Louis, Mo., composed of the same Johnson, Bolinger, and Young above named as composing the Arcadia Planing Mill Company, directed W. E. Nelson, its Louisiana agent at Shreveport (the same who indorsed the note sued on), to go to Arcadia and see about purchasing at the sale, and making arrangements for procuring locally the necessary funds. Nelson testified that his instructions included a special instruction to make the purchase jointly with J. A. Cleaton. Johnson, who gave the instructions, testified that they were to get “some one who was in close touch with the interest in this section” to take a one-third interest. He makes no mention of Cleaton. The sale was advertised to take place on Saturday, December 12, 1908. On the preceding day, Nelson had an interview with L. M. Tooke, cashier of the plaintiff bank, which is the local bank. As to what was said at this interview, Nelson and Tooke disagree. Nelson says that Tooke agreed to let the Union Mill & Lumber Company have two-thirds of whatever amount might be necessary for buying the property, and to accept its unsecured note for the loan, and also to let Cleaton have the money necessary to buy one-third, and to accept his unsecured note for the amount; that Tooke’s identical words were that—
“he would let Cleaton have the money and not be hard on him; he could arrange for it there.”
Tooke testifies that he agreed to let the Union Lumber Company, which he knew to be a large, strong concern, have on its note whatever amount it might need for purchasing the plant; and that nothing whatever was said about Cleaton. In a letter addressed to Tooke, under date of December 19, 1908, seven days after the sale, Nelson says:
“The St. Louis office instructed me not to take in any partners that could not arrange for their-own funds.”
In this same letter, he says:
“You will recall that the writer had an understanding with you about Mr. Cleaton’s paper that day I was in Arcadia to bid on this property, which was December 12th, -and you stated that you would let him have this money and would not be hard on him about the indorsement.”
Tooke does not deny that on the day of the sale he agreed with Nelson to let Cleaton have the money, but says that what he told him was that he would not be too- hard on Cleaton about securing the loan—
“That he guessed that Cleaton had some good collateral that he could secure the paper with, or give good indorsement.”
Nelson and Cleaton both bid at the auction, whether in concert or in opposition to each other is not ascertainable from the record. The property was adjudicated to one Merritt; and both Nelson and Cleaton boarded the train to leave. As the train was moving off, they were informed that Merritt was unable to comply with the bid, and that the property would be again auctioned on the same day. At Gibbsland, which was, we understand, the first stop of the train, Nelson got off, and telephoned to Tooke with regard to bidding at this second crying. He testifies that his instructions were to bid in the property in the proportion of two-thirds to the Union Mill & Lumber Company and one-third to Cleaton. Cleaton testifies that he also telephoned to the same effect. Tooke testifies that Nelson alone telephoned him, and that the instructions were to buy for the Union Mill & Lumber Company. Several witnesses testified that he announced at the sale that he was buying for that company, under *293 instructions from Nelson over the telephone, and that he himself incurred no responsibility whatever in the matter. The adjudication was made to the Union Mill & Lumber Company for $5,520. On the following Wednesday, Nelson returned to Arcadia and caused the deed of sale to be made in favor of the Arcadia Planing Mill Company. The Arcadia Planing Mill Company was a new partnership, entered into for the purpose of taking and operating the sawmill and planing plant, and was composed of Cleaton and of the same three persons composing the Union Mill & Lumber Company, namely, Johnson, Bolinger, and Young. Nelson went to the plaintiff bank and executed in its favor the note of the Union Mill & Lumber company for $3,680, being two-thirds of the price of the sale. It was agreed that this note should be exchanged later for another, signed by the St. Louis office. The bank paid the $3,680 to the officer who had made the sale, and Nelson returned to Shreveport. Two days later, the bank having refused to accept Cleaton’s note for the remainder of the purchase price, $1,840, without security of some kind, the note was forwarded to Nelson at Shreveport for him to indorse for the Union Mill & Lumber Company. This Nelson refused to do, and returned the note in a letter, in which he said that he had already told Tooke that he had no instructions from the St. Louis office to indorse for Cleaton, and that he (Tooke) had promised not to be hard on Cleaton about indorsements. Tooke mailed the note back to Nelson, saying that he could not let Cleaton have the money without security, and that the note had been sent to him for indorsement, because Cleaton had said that Nelson’s company would indorse for him. Other letters passed between the parties. In one of them Nelson says to Tooke:
“I have had another talk with Cleaton. He is willing to give the interest he has purchased in this property as security for the loan.”
This was not satisfactory to Tooke, and, on January 9, 1909, Nelson came again .to Arcadia. How to arrange the matter was discussed by the parties, and the plan was adopted of Cleaton executing the note sued on in favor of the Arcadia Planing Mill .Company, and of Nelson, acting as the agent .of the company, indorsing it over to the plaintiff bank, and also indorsing it individually. The bank then paid the amount of the note to the officer making the sale.
[3, 4] Throughout the offering of evidence, objection was made to the admission of any parol evidence to prove authority on the part of Nelson to indorse for the Arcadia Planing Mill Company. The objection being founded on article 2278, C. C., to the effect that “parol evidence shall not be received to prove any promise to pay the debt of a third person. But the debt sued on is not the debt of a third person. It is that of the Arcadia Planing Mill Company. Tooke never consented to accept Cleaton as sole debtor on the note, and never in point of fact did so, and never let Cleaton have the money. What he did was to purchase from the Arcadia Planing Mill Company the note of Cleaton, and let the company have the money. And the question is, not as to whether Nelson had authority to indorse for a third person, but whether he, or he and Cleaton together, .had authority to represent the Arcadia Planing Mill Company in the transaction by which the said note was executed and transferred in the manner stated. We think that the record leaves no doubt whatever on that score. The Arcadia Planing Mill Company was a subsidiary company to the Union Mill & Lumber Company; the members were the same, plus Cleaton. And Nelson was the Louisiana representative of the Union Mill & Lumber Company, or of its members, with apparently very extensive powers. Under his general authority, he entered into important contracts. As has been seen, he represented *295 ■ said company in the purchase of this saw:mill and planing plant; the important point as to price being left to his good judgment, ' with full powers to make arrangements for procuring the necessary funds locally. In so doing, he executed a note for said company. It was he who acted for the said company in forming the partnership with Oleaton. 'It was he who gave the name of Ar- ' cadia Planing Mill Company to this partnership. It was he who selected and appointed ■ a manager for the affairs of this partnership, without even, as far as the record shows, consulting Oleaton, and fixed the amount of '■this manager’s salary. In accrediting this 'manager to the plaintiff bank, he wrote:
“Mr. J. W. York went over this morning to take eharge 'of- the Arcadia Planing- Mill for .us, and he has full authority to represent us in the management of the plant in his hands. He is authorized to sign checks, indorse paper and execute any necessary writings. I have full authority personally to sign this letter; but if you wish the same in writing from our Mr. Johnson of St. Louis, advise me first what is' wanted' and I will take the matter up with the St. Louis office. This however is unnecessary,”
' 'This letter is written from Shreveport as of daté January 14, 1909, and is signed “Union Mill and Lumber Company, per W. É. •'Nelson.” True this was several days after ■ the' note sued on had been transferred to the plaintiff bank, but it shows what authority Nelson had to represent the St. Louis •'members of the Arcadia Planing Mill Company in organizing that company and starting it in business. And a necessary step in ■that connection -was to pay for the sawmill .and planing plant which had been adjudicated to Ms St. Louis principals; and this to the •extent of one-third was done by accepting Cleaton’s note and transferring it to the plaintiff bank in the manner stated.
Nelson' and Oleaton testify that this note was thu's executed and transferred under an understanding with Tooke that the Arcadia Planing. Mill Company was to be a party merely as a matter of form; that the note should be considered to be that of Oleaton to the bank, and Oleaton and Nelson personally be alone responsible on it; that the Arcadia Planing Mill Company was not to be responsible on it, and that the shape in which we see it was given to it at the suggestion of Tooke, who said that an indorsement of some kind was necessary, in order to square him with the national banking laws, and who said, further, that the indorser would have to be apparently good, in order to square him with the board of directors of his bank, and that Nelson would not answer for this purpose, as he was pecuniarily irresponsible; that this plan was carried out after Nelson had positively informed Tooke that he had no authority to sign for the Arcadia Planing Company. Tooke and the bookkeeper of the bank, in whose presence the transaction was agreed to, testify that there was no such understanding, and that Nelson did not disclaim authority to sign for the Arcadia Planing Mill Company. We readily give greater credence to the latter witnesses, first, because the trial judge did so; and, secondly, because the probabilities are ail on that side. It is utterly improbable that Tooke, the managing officer of a bank, would have consented to take Cleaton’s unsecured note after having repeatedly and positively refused to do so, although strongly urged— we may say begged — to do so, and after having refused to accept the pledge or transfer of Cleaton’s one-third interest in the company as such security. Moreover, some discredit is thrown upon the testimony of Nelson by its inconsistency with his letter of December 19, 1908, transcribed supra, and with the testimony of Johnson. In this testimony, he denies that in the conversation in which Tooke agreed to make the loan to Oleaton anything was said about indorsement. He undertakes to give Tooke’s exact words, in order to show that the word “in *297 dorsement” was not spoken; and yet in his ■ said letter he reminds Tooke that he had promised in this same conversation not to be hard upon Oleaton about “indorsement.” He testifies positively that his instructions from Johnson were to form a partnership with Cleaton; whereas, Johnson says that the instructions were to “get some one who was in close touch with this section.” And some discredit is thrown, also, upon the testimony of Cleaton. He went to St. Louis and transferred his one-third interest in the Arcadia Planing Mill Company to his associates. At his return, he told several persons that the consideration of the transfer had been his liberation from the note now sued on, and the assumption by his associates of all liability on the note; whereas, he testified in this case that the consideration of said transfer had been his share of the losses sustained by the partnership.
Johnson testified that the first knowledge he had of said note having been executed was when he received notice of its protest. But in that statement he is contradicted by one of his own letters.
After the Union Mill & Lumber Company had been made adjudicatee of the sawmill and planing plant, and had paid two-thirds of the price, Nelson, its agent, found himself in the awkward position of having to do something to pay for the remaining one-third, and thereby secure control of the plant, so as to set the partnership agoing. This he did by the execution and transfer of this note. The transaction was therefore in due course of the partnership business. Nelson represented the St. Louis members, and Cleaton, the remaining partner, acted for himself.
As just stated, Cleaton made a transfer of his one-third interest in the partnership to his St. Louis associates. The consideration of the transfer was $1,840, the exact amount of the note, cent for cent. When he came back, he told several persons that he had transferred his said interest in consideration of his said partners agreeing to hold, him harmless on the note. He and Johnson testified that the consideration of the transfer was Cleaton’s share of the losses in the business of the firm; and in that statement they are corroborated by a lady stenographer in the St. Louis office, who testified that she heard their conversation, and that the consideration of the transfer was Cleaton’s share of the losses sustained by the partnership. In a sense, the debt represented by this note constituted a part of: the'losses, if losses there were, and- we can readily understand that, from simply hearing a conversation between the two men, this lady' may have gathered from it the meaning which she testifies to. But from- the fact of the transfer having been made for the exact amount of the note, and from- the statements made by Cleaton on his return,' and, in fact, from all the. circumstances' of the ease, the inference is irresistible that the assumption of the note was the consideration of the transfer.
There is an alternative demand that, in ease the defendant company is'not held liable on the note, the said'transfer "be set aside as in fraud of creditors. -The trial judge, having held the company liable, passed this alternative demand in silehce, and5 we, for the same reason, spare ourselves the trouble of discussing it.
After the absentee defendants had made themselves parties to the suit by appearing: and asking that the property attached' be, released to them on bond, they filed an ex-: ception, urging that the appointment of the curator ad hoe to represent them was • irregular, because the clerk of court who made it was without authority to do so; the clerk, being authorized to make such appointments' only in the absence o.f the .judge: from .the *299 parish, and the judge not having been absent from the parish at the time said appointment was made. The facts in that connection are that on the day the appointment was made the judge happened to be at a considerable distance from the parish seat, but near the boundary line of the parish; and that, as a matter of accommodation, he went into the adjoining parish and remained there a few hours, in order that in his absence from the ,/arish the clerk might make the appointment.
The absentee defendants having waived citation by making voluntary appearance in the suit, and there being no prayer that the attachment be set aside on the ground of want of authority on the part of the clerk to grant the order under which it was made, or, in fact, on any other ground, we are dispensed from passing on the question thus raised as to whether the said absence of the judge was of the character contemplated by the law.
Judgment affirmed.